UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 22-6148-GW-AFMx | Date | September 29, 2023 |
|---|---|---|---|
| Title | *Lashify, Inc. v. Urban Dollz LLC* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | None Present | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

**PROCEEDINGS:** IN CHAMBERS - FINAL RULING ON *MARKMAN*/CLAIM CONSTRUCTION

Attached hereto is the Court's Final Ruling on *Markman*/Claim Construction

: ___

Initials of Preparer   JG

***Lashify, Inc. v. Urban Dollz*** LLC; Case No. 2:22-cv-6148 GW-AFMx
Final Rulings on *Markman*/Claim Construction

## I. Introduction

Plaintiff Lashify, Inc. ("Lashify" or "Plaintiff") brought this action against Defendants Urban Dollz LLC, Doll House Corporation, and Urban Doll (collectively, "Urban Dollz" or "Defendants") alleging infringement of U.S. Patent Nos. 11,219,260 (the "'260 Patent"), 11,234,472 (the "'472 Patent"), 11,253,020 (the "'020 Patent"), 11,330,855 (the "'855 Patent"), and 11,330,856 (the "'856 Patent") (collectively, the "Asserted Patents"). Second Amended Complaint ("SAC"), Docket No. 147. The parties raise several claim construction disputes relating to the Asserted Patents. They filed the following claim construction briefs and supporting documents:

- Joint Claim Construction and Prehearing Statement (Docket No. 144);
- Plaintiff's Opening Claim Construction Brief (Docket No. 169);
- Defendants' Responsive Claim Construction Brief (Docket No. 179);
- Plaintiff's Reply Claim Construction Brief (Docket No. 181).

The Court construes the disputed terms as stated herein.

## II. Background

The Asserted Patents, titled "Artificial Lash Extensions" (the '260, '472, '020, and '856 Patents) or "Method of Applying Artificial Lash Extensions" (the '855 Patent), share a specification and claim priority to U.S. Provisional Patent Appl. No. 62/368,116 (the "Provisional Application") filed on July 28, 2016. They each relate to artificial lash extensions and methods of applying or manufacturing lashes.

Eyelash extensions are artificial lashes designed to "enhance the look, length, and fullness of natural eyelashes." '260 Patent at 1:26-30. Conventional artificial lash application typically requires distribution of individual clusters of artificial lashes across the width of the wearer's lash line. *Id.* at 1:36-50. It may also require application of the lash extensions to the wearer's eyelid, which can cause wearer discomfort and look fake. *Id.*

The Asserted Patents purport to address these issues by teaching artificial lash extensions applied to the underside of the wearer's natural eyelashes. *Id.* at 3:24-33. The lash extensions may include clusters of artificial lashes arranged in a configuration that follows the curve of a wearer's lash line. *Id.* The lash extensions (sometimes called the "lash fusion") may include

1

clusters of artificial lashes that are fused together to form a straight line. *Id.* at 3:1-5. Figure 3A shows two styles of lash extensions having clusters of artificial hairs along a base of the lash extension. *Id.* As depicted below, "Style 1" includes nine clusters of artificial hairs, while "Style 2" includes five clusters of artificial hairs. *Id.* at Fig. 3A.



Clusters of artificial lashes include multiple hairs and can be made of "natural materials" (e.g., human or animal hair) or "synthetic materials (e.g., acrylic resin, polybutylene terephthalate (PBT) or synthetic mink hair made of polyester)." *Id.* at 2:42-47. Hairs and clusters in a lash extension may be connected by applying heat to the lashes, such as through heat sealing, hot melt methods, or applying heat to adhesives that cause the hairs or clusters to attach. *Id.* at 2:48-50, 7:52-63 (hot melt method), 4:41-49, 5:14-16, 7:37-40 (heat sealing), 4:50-55, 7:64-8:4 (heating adhesives). Hairs and clusters may also be connected using glue or other adhesives. *Id.* at 4:55-58; 8:4-8. In such embodiments, the hairs and clusters may be exposed to a curing assembly (e.g., a heater, dryer, or light source) that causes the adhesive to solidify. *Id.* at 4:50-55. The lash extension can be "placed underneath an individual's natural lashes" and "appear seamless and blend in with an individual's natural lashes." *Id.* at 3:1-17.



The parties request construction of seven disputed terms which appear throughout the Asserted Patents. Claim 1 of the '260 Patent is representative of the technology at issue and recites:

2

1. An artificial lash extension system comprising:

    a plurality of lash extensions, each of the plurality of lash extension comprising:

    a plurality of clusters of artificial hairs, each of the plurality of clusters comprising at least two artificial hairs; and

    ***a base***, wherein the plurality of ***clusters are attached to the base by at least an application of heat***, wherein the at least two artificial hairs of each of the plurality of clusters protrude from the base, wherein at least some of the artificial hairs of at least one of the plurality of clusters are coupled to one another at a respective part of the base, and wherein the base is ***designed to at least attach the lash extension to an underside of natural lashes***.

'260 Patent, Claim 1 (emphasis added to show disputed terms).

### III.     Legal Standard

Claim construction is an interpretive issue "exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). It is "a question of law in the way that we treat document construction as a question of law," with subsidiary fact-finding reviewed for clear error to Fed. R. Civ. P. 52(a)(6). *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S.Ct. 831, 837-40 (2015). The claim language itself is the best guide to the meaning of a claim term. *See Vederi, LLC v. Google, Inc.*, 744 F.3d 1376, 1382 (Fed. Cir. 2014). This is because the claims define the scope of the claimed invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). But a "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent." *Id.* at 1313. Thus, claims "must be read in view of the specification," which is "always highly relevant to the claim construction analysis." *Phillips*, 415 F.3d at 1315 (internal quotations omitted).

Although claims are read in light of the specification, limitations from the specification must not be imported into the claims. *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009). "[T]he line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms." *Phillips*, 415 F.3d at 1323.

The prosecution history may lack the clarity of the specification, but it is "another established source of intrinsic evidence." *Vederi*, 744 F.3d at 1382. "Like the specification, the

prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317 (citations omitted). "Furthermore, like the specification, the prosecution history was created by the patentee in attempting to explain and obtain the patent." *Id.* "Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

Claim construction usually involves resolving disputes about the "ordinary and customary meaning" that the words of the claim would have had "to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312-13 (internal quotations and citations omitted). But in some cases, claim terms will not be given their ordinary meaning because the specification defines the term to mean something else. "[A] claim term may be clearly redefined without an explicit statement of redefinition," so long as a person of skill in the art can ascertain the definition by a reading of the patent documents. *Id.* at 1320; *see also Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1364 (Fed. Cir. 2016).

Where the patent itself does not make clear the meaning of a claim term, courts may look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean," including the prosecution history and "extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314 (internal quotations omitted). Sometimes, the use of "technical words or phrases not commonly understood" may give rise to a factual dispute, the determination of which will precede the ultimate legal question of the significance of the facts to the construction "in the context of the specific patent claim under review." *Teva*, 135 S. Ct. at 841, 849. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. "In such circumstances, general purpose dictionaries may be helpful." *Id.*

**IV.    Discussion**

   *A.  Defendants' Request for Factual Findings*

With their proposed claim constructions, Defendants request certain factual findings relating to the melting point of polybutylene terephthalate ("PBT"). Docket No. 179 at 3-6. PBT is one of the synthetic materials that can be used to make the artificial eyelashes claimed in the

Asserted Patents. *Id.* The Court declines to make factual findings at this stage of the litigation. Claim construction is primarily a question of law and requires the Court to determine what the disputed terms mean within the context of the Asserted Patents. *See Teva*, 135 S. Ct. at 837-40. Here, the Court can resolve the parties' claim construction disputes without determining the scientific melting points of specific polymers. The parties may raise arguments regarding the properties of the accused products and the prior art in later stages of litigation. *See SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985).

### B. Agreed Upon Claim Terms

The parties do not agree upon any constructions.

### C. Disputed Claim Terms

1. "a base / performing an attachment process to attach the plurality of clusters along a length of a base / clusters [is/are] attached to the base / the artificial hairs are connected to one another at a respective part of the base" ('260 Patent, Claims 1 and 19; '472 Patent, Claim 1; '020 Patent, Claim 1; '855 Patent, Claim 1)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "pre-existing clusters of artificial hairs are joined to a pre-existing base" |

#### i. Summary of Contentions

The parties dispute whether the "clusters" and the "base" must "pre-exist" as entirely separate entities.

Plaintiff argues these terms should take their plain and ordinary meaning because they are readily understandable to a person of ordinary skill in the art ("POSA"). Docket No. 169 at 10-11. Specifically, Plaintiff argues that "base" refers to the bottom portion of the lash extensions, from which the artificial hairs and clusters protrude. *Id.* at 6 (citing '260 Patent at 3:1-5 (describing base created by connecting clusters together)). Similarly, Plaintiff argues that "cluster" refers to a group or bunch of artificial eyelashes or fibers. *Id.* at 7 (citing '260 Patent at 4:30-34 (describing clusters tied to support thread base)). Plaintiff also argues that its expert, Vivian Baker, opined that the "base" of a lash extension is the bottom part of the lash extension, and a "cluster" refers to a group of lashes. *See* Opening Expert Report of Vivian Baker Regarding Claim Construction ("Baker Report"), Docket No. 169-8 ¶ 17; Rebuttal Expert Report of Vivian Baker Regarding

5

Claim Construction ("Baker Rebuttal"), Docket No. 168-13 ¶ 8.

Defendants argue the terms "base" and "clusters" should be construed as separate, pre-existing structures. Docket No. 179 at 9. Specifically, Defendants argue that the Asserted Patents use of the word "attached" to indicate that the "base" and "clusters" exist separate and apart from each other before being "attached." *Id*.

> ii. *Analysis*

The Court finds the disputed terms should take their plain and ordinary meaning. None of the words in the disputed terms require technical knowledge or are ambiguous such that they require construction beyond their plain and ordinary meaning. Additionally, the Court finds Defendants' "pre-existing" requirement unduly narrow and unsupported by the specification. The phrase "attach . . . to the base" does not necessarily require that the base and the lash clusters always exist separately from each other. Rather, the disputed terms are better read as disclosing the "physical characteristics of the product, not the method of its manufacture." *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1356-57 (Fed. Cir. 2003) ("Nothing about the phrase 'slots formed therein' suggests that the slots must be formed by a particular process; the phrase certainly does not indicate that the wall must be formed first and the slots formed later.").[1]

Further, Defendants' proposed construction would read out an embodiment of the invention. The specification discloses that lash clusters fuse together to form the base. *See, e.g.*, '260 Patent at 3:1-4 ("[A] lash fusion can include multiple clusters that are fused together near the inner ends of the artificial lashes (also referred to as the 'base' of the lash fusion)."); 3:18-20 (describing "[t]he base of the lash fusion" as the place where "where the multiple clusters are fused together."); 7:47-50 ("[T]he lash fusion can include multiple clusters that are fused together near one end (i.e., the base)."). "[A]n interpretation which 'excludes a [disclosed] embodiment from the scope of the claim is rarely, if ever, correct." *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013) (quoting *Accent Pkg., Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Fir. 2013).

Accordingly, the Court declines to construe this term. Plain and ordinary meaning governs.

> 2. "attached . . . by at least an application of heat / connected . . . by at least an application of heat / connect[ing/ed] . . . at least in part by applying the

---

[1] The ITC also rejected Defendants' proposed "pre-existing" requirement. *See* Docket No. 169-9 at 26-27.

heat / connected . . . by applying the heat / applying . . . heat to . . . attach / connected together [. . .] by at least the application of heat / connected by an application of heat" ('260 Patent, Claims 1, 7 and 25; '472 Patent, Claims 1 and 17; '020 Patent, Claims 1, 2, and 4; '855 Patent, Claims 1, 13, and 21; '856 Patent, Claims 1 and 5)

| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
|---|---|
| Plain and ordinary meaning | "join two elements together by the application of heat, rather than adhesive, such that the two elements are not easily separated" |

      i.    *Summary of Contentions*

The parties dispute whether this term should include the additional limitations "rather than adhesive" and "such that the two elements are not easily separated." *See* Docket No. 179 at 9-14.

Plaintiff argues that construction is unnecessary because the meaning of the disputed claim terms is readily understandable. Docket No. 169 at 10-13. Specifically, each disputed claim term includes the phrase "at least" when disclosing attachment by heat. *Id.* 11. This language suggests that, at a minimum, heat is required when joining the clusters or attaching them to the base, but it does not preclude using heat in conjunction with other elements. *Id.* Further, the specification and dependent claims teach an embodiment disclosing use of heat in conjunction with adhesive. *Id.* at 11-12. Finally, Plaintiff argues that the phrase "not easily separated" unduly narrows the claim scope and is not supported by the claims or specification. *Id.* at 12.

Defendants argue the claims teach that clusters "are attached to the base . . . by at least an application of heat" and thus require attachment by heat resulting in a bond that is not easily separated. *Id.* at 11. Further, Defendants argue that the claims in which the disputed terms arise "do not recite any cause other than heat, such as an adhesive, that would make that attachment." *Id.* Other claims, such as claims 12 and 13 of the '472 Patent, do recite "applying an adhesive" and "curing the adhesive" by heat to form the lash fusions. *Id.* (citing Patent '472 at 10:13-20). Finally, Defendants argue that the specification is incorrect and contradicts the Provisional Application, to which the Asserted Patents claim priority. *Id.* at 9-10. The Provisional Application teaches melting PBT hairs to a temperature range of "approximately 200-250 °C (e.g., 225 °C)." *See* U.S. Provisional Patent Appl. No. 62/368,116 ¶ [0032]. The '260 Patent teaches a much lower temperature range of 55-110 °C. Docket No. 179 at 13.

7

      *ii.*  *Analysis*

  The Court finds construction unnecessary. Contrary to Defendants' position, the two methods of joining clusters of lashes (heat or an adhesive) are not mutually exclusive and can co-exist. Each disputed claim term uses the phrase "at least," indicating that a use of heat is required, but not exclusive. In fact, the specification teaches that clusters may be connected "using a glue or some other adhesive" which is then exposed to a curing assembly which utilizes heat. *See* '260 Patent at 7:63-66 ("As another example, the multiple clusters could be connected together using a glue or some other adhesive composed of various substances."). The Provisional Application for also discloses that "the multiple clusters could be fused together using a 'hot melt' method or by using a glue or other adhesive composed of various substances." *See* U.S. Provisional Patent Appl. No. 62/368,116. at ¶ [0032].

  Although many embodiments, including some of the dependent claims in which this disputed term appears, disclose only heat rather than an adhesive in addition to heat, neither the claims nor the specification limits the invention to only using heat "rather than adhesive." Docket No. 179 at 11. Several dependent claims expressly claim fusion by an adhesive. *See, e.g.*, '260 Patent at 9:54-59 ("14. The artificial lash extension system of claim 1, wherein each of the plurality of lash extension is further formed by an application of an adhesive." and "15. The artificial lash extension system of claim 14, wherein the plurality of clusters are connected together by at least the application of the adhesive."). Thus, if the Court adopted Defendants' proposed construction, certain claimed and disclosed embodiments would be excluded. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004) ("[I]t is improper to read limitations from a preferred embodiment described in the specification . . . into the claims absent a clear indication that the patentee intended the claims to be so limited.").

  Further, the Court finds no compelling reason to add the limitation "such that the two elements are not easily separated." Defendants argue that because heat is required to connect the elements of the artificial lash extensions, it necessarily follows that the two elements are not easily separated. Docket No. 179 at 10-11. However, there is nothing in the specification or the claims discussing the strength of the bond between the elements of the artificial lashes. *See Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 950 (Fed. Cir. 1993) (finding the district court erred in interpreting "straw-shaped, channel-forming elements" to mean "straw-sized" because the phrased used in the patent's claim "unambiguously relate[d] to *shape* not *size*") (emphasis in original).

8

Finally, the Court is not convinced that a temperature range disclosed in the provisional application would support Defendants' proposed construction. Defendants' argument that the PBT embodiment is not operable does not support Defendants' proposed construction. *See Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("[C]ourts may not redraft claims, whether to make them operable or to sustain their validity"). The parties may reserve arguments on this topic for the summary judgment.

Accordingly, the Court declines to construe this term. Plain and ordinary meaning governs.

3. "formed by at least the application of heat / applying the heat . . . to form"

('260 Patent, Claims 6, 14, and 24; '472 Patent, Claim 11; '020 Patent, Claim 3; '855, Claim 12; '856 Patent, Claim 4)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "applying heat of a temperature sufficient to melt or mold an element into its desired shape" |

i. *Summary of Contentions*

The parties dispute whether heat must be applied above a specific temperature threshold. Defendants argue that forming a base or a lash extension by an application of heat necessarily involves applying heat of a temperature sufficient to melt or mold the base to its desired shape. Docket No. 179 at 15-16. Specifically, Defendants argue that the Asserted Patents and their shared specification distinguish artificial lash extensions formed using heat from lashes applied with glue or adhesive. *Id.* at 15. Therefore, per Defendants, when heat alone forms the lashes, the temperature must be sufficient to melt or mold the polymer into the desired shape. *Id.*

Plaintiff argues that both a jury and a POSA would readily understand the term's plain and ordinary meaning, and that construction is unnecessary. Docket No. 169 at 13-14. The claim language does not require "melting" or "molding," and the word "formed" is not limited to those two methods of forming a structure. Further, Plaintiff again argues that the claims at issue qualify the application of heat with the phrase "at least." *Id.* Per Plaintiff, this language shows the applicant's intent to not disclaim other, additional, methods of adhesion. *Id.* Plaintiff also argues that the phrase "temperature sufficient to melt or mold" improperly alters the terms' meaning because the specification teaches attaching clusters or hairs to each other at a temperature well below the scientific melting point of the hairs or clusters. *Id.* at 14. The specification also teaches clusters that consist of natural materials that do not melt at all. *Id.* at 14. Finally, Plaintiff argues

9

the claim language at issue does not require any "desired shape," rendering inclusion of this limitation improper. *Id.*

        ii.  *Analysis*

  The term at issue requires no construction because its plain and ordinary meaning is readily understandable. As a threshold issue, the Court finds the phrase "at least" shows the applicant's intent to cover embodiments that use heat and potentially other methods to form the base of the lash extensions. This language does not exclude embodiments that use heat in addition to other means of adhesion, such as a glue. Second, the claims and specification do not teach that any materials reach their scientific melting point. While some methods of forming the base or lash clusters certainly involve heat, which begins the melting process, complete melting of the materials is not required. *See, e.g.*, Patent '260 at 7:35-40 ("The hot melt method requires that the multiple artificial hairs be heated to a temperature that is sufficient to cause the individual lashes to begin to melt. For example, artificial hairs made of PBT could be heated to approximately 55-110 °C at one end during a heat seal process (during which the heated ends begin to fuse to one another)." Finally, neither the claims not the specification requires that the disclosed process achieve a specific shape. Therefore, the Court finds Defendants' proposed construction both unnecessary and unsupported by the claims and specification.

  Accordingly, the Court declines to construe this term. Plain and ordinary meaning governs.

      4.  *"intersecting portion[s]"* ('856 Patent, Claims 1, 5, 10, and 11)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "location[s] where artificial hairs crisscross each other above the base" |

        i.  *Summary of Contentions*

  The parties dispute whether the "intersect[ion]" must occur at a specific location. Defendants' proposed construction substitutes the word "intersecting" for "crisscross[ing]" and adds "above the base" to the disputed claim term. In support of their construction, Defendants argue that Claim 1 of the '856 Patent describes the "intersecting portions" as distinct structures connected by an application of heat at the intersecting portion. Docket No. 179 at 25. Thus, per Defendants, the claims teach two pre-existing clusters placed next to each other and then connected together at an "intersecting portion" above the base. *Id.* Defendants argue the prosecution history for the '856 Patents supports this interpretation because the examiner found language clarifying

that the intersection point of the lashes is "at a point remote from their base" distinguished the claimed invention from the prior art. *Id.* (quoting Prosecution History, Docket No. 179-6 at 5873).

Plaintiff argues that the phrase "intersecting portion[s]" is readily understandable and requires no construction. Docket No. 169 at 19-20. Additionally, per Plaintiff, dependent claims in the '856 and '472 Patents preclude a limitation that the hairs intersect each other above the base. *Id.* at 20.

*ii.     Analysis*

The Court finds plain and ordinary meaning applies to the disputed terms. Nothing in the claims or specification require that the intersecting portion(s) of the lash extensions be above the base. In fact, some dependent claims disclose other configurations. *See, e.g.*, '472 Patent, Claim 11 (disclosing "applying the heat at one or more intersecting portions to form the base along the one or more intersecting portions"); '856 Patent, Claim 2 (disclosing that "the first cluster crosses the second cluster between the two ends of respective artificial hairs of the first cluster and the second cluster"). While the hairs in a cluster may intersect above the base in some embodiments, the Court cannot read the claims to exclude other, disclosed embodiments. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). The Court cannot adopt Defendants' proposed construction both because it is unnecessary and because it adds limitations unsupported by the specification. *See Hoganas AB*, 9 F.3d at 950 ("It is improper for a court to add extraneous limitations to a claim.") (internal quotations omitted).

As to Defendants' arguments regarding the '856 Patent prosecution history, the issued claims do not include any requirement that the intersection point is "remote from" or "above" the base and the applicant never amended the claims to include this kind of limiting language. *See* Prosecution History, Docket No. 179-6 at 5956. Thus, the Court will not read in limitations mentioned in the prosecution history that are not present in the claims themselves. *See Cadence Pharm. Inc. v. Exela PharmSci Inc.*, 780 F.3d 1364, 1373 (Fed. Cir. 2015) (declining to find that portions of the prosecution history amounted to a "clear and unmistakable disavowal of the unambiguous recitation" in the patent's claims).

Accordingly, the Court declines to construe this term. Plain and ordinary meaning governs.

5. *"partial melting / begin to melt"* ('260 Patent, Claims 11 and 29; '472 Patent, Claim 8; '020 Patent, Claim 10; '855 Patent, Claim 16; '856 Patent, Claim 6)

11

| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
|---|---|
| Plain and ordinary meaning | "applying heat of a temperature sufficient to cause two elements to begin to form a single entity" |

### i. Summary of Contentions

The parties dispute whether this term should be tied to a specific temperature and a specific physical change. Plaintiff argues that the claims and specification do not support any requirement that the two elements be heated to a "temperature sufficient to . . . form a single entity." Docket No. 169 at 15-16. Additionally, Plaintiff argues that Defendants' proposed construction is incorrect because it requires the clusters to reach their respective scientific melting temperatures. *Id.* Defendants argue that the word "melt" necessarily requires that the polymers be heated to the specific temperature at which the substances begin to melt. Docket No. 179 at 16-17. Defendants argue that a POSA would understand the disputed terms to mean that, "when heat is applied to polymer pieces at a temperature close to the melting point that is sufficient to cause a partial melting or a melting of their surfaces, the two elements begin to form a single entity because the molecules of the molten surfaces may intermingle." *Id.* at 16 (citing Opening Expert Report of Dr. Robert A. Wanat On Claim Construction, Docket No. 179-2 ¶¶ 89-96; 151).

### ii. Analysis

First, the claims themselves do not recite a requirement that the elements reach a specific temperature. Although the language "begin to melt" and "partial melting" implies an increase in temperature and the beginning of a phase change, neither term contemplates a specific temperature and neither requires formation of "a single entity." Certain embodiments disclose using heat to fuse the lash clusters together, while others contemplate a method in which clusters of artificial hairs are "heated . . . and then secured to one another" or "heated near a central point and folded underneath one another." '260 Patent at 4:23-29. Thus, while some embodiments may require a specific temperature range, the claims do not include such limiting language. The Court declines to import limitations from the specification into the claims. *See Abbott Labs.*, 566 F.3d at 1288.

Second, the specification recites that "artificial hairs made of PBT could be heated to approximately 55-110° C," a temperature well below PBT's scientific melting point. *Id.* at 7:37-40. Thus, adding a requirement that the elements are heated up to or near a temperature at which they "begin to form a single entity" could exclude embodiments expressly discussed in the specification. *See Hoganas AB*, 9 F.3d at 950 ("It is improper for a court to add extraneous

12

limitations to a claim.") (internal quotations omitted). For both of these reasons, Defendants' proposed construction is not correct.

Additionally, the parties raise a fact dispute as to the scientific melting point of PBT. For instance, Defendants request fact findings that "[t]wo pieces of PBT heated between 55°C and 110°C do not begin to fuse to one another" and "[t]wo pieces of PBT must be heated above 200°C to begin to stick together without glue, friction, or mechanical interlocking." Docket No. 179 at 8. As discussed above, this dispute does not bear on claim construction. Still, the scientific melting point could depend on other factors including the purity of the PBT. The presence and quantity of other components could affect melting point and a range of temperatures could potentially represent the melting point under real world conditions. For at least these reasons, the Court would benefit from a more developed record to resolve these factual issues and defers resolution until the summary judgment stage. Claim construction based on resolution of these fact issues in Defendants' favor is not appropriate. Additionally, only some dependent claims require PBT. Thus, at the claim construction stage and separate from any consideration of accused products, the scientific melting point of PBT is not necessarily relevant.

Still, the terms "partial melting" and "begin to melt" are somewhat ambiguous. The specification provides some guidance as to the meaning of the terms. For instance, Fig. 8 depicts a flow diagram for a lash fusion process with steps including "form clusters" and "fuse multiple clusters together." In describing Fig. 8, the specification explains, "[c]lusters of artificial lashes are initially formed using, for example, a hot melt method in which artificial hairs are heated and connected to one another (step 801). '260 Patent at 7:24-27. The specification further explains, "[a]s the individual artificial hairs begin to melt, the multiple clusters will connect to one another near the base to form a straight line of artificial hairs, thereby forming a lash fusion." *Id.* at 7:60-63. Thus, the specification defines "partial melting" or "begin to melt" as a stage in the phase change process in which some of the lashes in a cluster connect to one another.

Accordingly, the Court construes "partial melting / begin to melt" as "heated portion(s) of one or more lashes of the cluster of lashes begin to connect to one or more other lashes."

      6. *"applying the heat . . . to seal the plurality of clusters along the length of the base"* ('472 Patent, Claim 7)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning. | "applying heat and pressure in sufficient amounts to cause the plurality of clusters to |

13

| | |
|---|---|
| | form a single entity along the length of the base" |

    *i.*    *Summary of Contentions*

The parties dispute whether application of the lashes specifically requires a supply of heat over a particular temperature threshold. Plaintiff argues the disputed term is readily understandable and does not require construction. Further, Plaintiff argues Defendants' proposed construction includes extraneous terms and limitations that the specification does not support. Docket No. 169 at 16-17. Defendants argue a POSA would understand the disputed term to mean heat and pressure must be applied "in sufficient amounts to cause the plurality of clusters to form a single entity along the length of the base." Docket No. 179 at 17-18. Defendants cite claim 7 in support of their position, arguing a POSA would understand the word "seal" to refer to "heat sealing." Defendants also point to technical manuals that define "heat sealing" as a "method of joining plastic films by the simultaneous application of heat and pressure to the areas in contact" where the "sealing temperature" is the "temperature . . . required to join two or more films or sheets in contact by fusion." *Id.* (quoting Concise Encyclopedia of Plastics, Docket No. Docket No. 179-14 at 34094).

    *ii.*    *Analysis*

The Court declines to apply Defendants' proposed construction for substantially the same reasons discussed above with respect to "partial melting / begin to melt." Additionally, neither the specification nor claim 7 requires applying pressure to the lash extensions to form a single entity. In fact, the Asserted Patents mention pressure only with respect to a pressure-sensitive adhesive. *See* '260 Patent at 8:7-8 ("An adhesive (e.g., a pressure-sensitive adhesive) can then be applied to the top of the lash fusion (step 803).").

Defendants rely primarily on extrinsic evidence to support their construction. In some cases, "extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art" may be useful in determining the scope of a patent; however, such evidence is only necessary where the patent itself does not sufficiently clarify the meaning of the claim term. *Phillips*, 415 F.3d at 1314 (internal quotations omitted). The Court finds no such ambiguity with respect to the term "seal." Also, "seal" is not so technical that the Court must give it a particular meaning beyond its ordinary definition. *See id.* ("In some cases, the ordinary meaning of claim

language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.").

Accordingly, the Court declines to construe this term. Plain and ordinary meaning governs.

7. *"designed to attach to the underside of [the/a] natural lashes / designed to at least attach the [artificial] lash extension to an underside of natural lashes / designed for an application under the natural lashes"* ('260 Patent, Claim 1 and 19; '472 Patent, Claim 1; '020 Patent, Claim 1; '856 Patent, Claims 19-20)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning. | "configured to allow adhesive to be applied to the top of the artificial lash" |

i. *Summary of Contentions*

The parties dispute whether adhesive must be applied only to the top of the artificial lash. Defendants argue their construction is consistent with the claims in which the disputed term appears. *See* Docket No. 179 at 19-20. Further, Defendants argue that a POSA would understand the claim language requiring that the "lash extension" be attached or applied to the "underside" of natural lashes to mean that "such attachment can only be achieved by adhesive on the top of the lash extension, which in turn means that the lash extension must be 'configured to allow adhesive to be applied to the top of the artificial lash.'" *Id.* Plaintiff argues that all words in the term are easily understandable by a POSA without any construction. Docket No. 169 at 18-19. Further, Plaintiff argue Defendants' proposed construction contradicts the specification, which discloses applying adhesive to either the top of each lash fusion in the set or directly to the user's natural lashes. *Id.*

ii. *Analysis*

The Court finds construction unnecessary. Nothing in the claim terms or the specification limits attaching the lash fusions to the user's natural lashes by applying adhesive only to the top of the lash extension. In fact, the opposite is true. *See* '260 Patent at 5:48-50 ("An adhesive can be applied to the top of each lash fusion in the set"); 6:58-60 ("Additionally or alternatively, an adhesive could be applied to the individual's natural lashes"). Thus, Defendants' construction cannot be correct because it would exclude several embodiments of the invention. *Vitronics*, 90

15

F.3d at 1583.

Even to the extent applying an adhesive directly to the top of the lash extensions is a preferred embodiment, the Court cannot read the embodiment to limit the claims "absent a clear indication that the patentee intended the claims to be so limited." *Liebel-Flarsheim*, 358 F.3d at 913. In fact, the only claims that unambiguously limit where adhesive should be applied are claims 7 and 8 of the '855 Patent. *See* '855 Patent, Claim 7 ("applying the adhesive to the underside of the natural eyelashes") and Claim 8 ("applying the adhesive to the one or more lash extensions of the set of lash extension"). Further, these claims indicate the applicant intended to distinguish between applying adhesive to the underside of the user's eyelashes and applying adhesive to the lash extensions themselves. The fact that the applicant did not make this distinction in the claims at issue suggests the Court should afford the claims at issue a broader scope.

Accordingly, the Court declines to construe this term. Plain and ordinary meaning governs.

## V. CONCLUSION

For the reasons stated herein, the Court construes the disputed terms as follows:

| Term | Asserted Claim(s) | Court's Construction |
|---|---|---|
| "a base / performing an attachment process to attach the plurality of clusters along a length of a base / clusters [is/are] attached to the base / the artificial hairs are connected to one another at a respective part of the base" | '260 Patent, Claims 1, 19; '472 Patent, Claim 1; '020 Patent, Claim 1; '855 Patent, Claim 1. | Plain and ordinary meaning. |
| "attached . . . by at least an application of heat / connected . . . by at least an application of heat / connect[ing/ed] . . . at least in part by applying the heat / connected . . . by applying the heat / applying . . . heat to . . . attach / connected together [. . .] by at least the application of heat / connected by an application of heat" | '260 Patent, Claims 1, 7, 25; '472 Patent, Claims 1, 17; '020 Patent, Claims 1, 2, 4; '855 Patent, Claims 1, 13, 21; '856 Patent, Claims 1, 5. | Plain and ordinary meaning. |
| "formed by at least the | '260 Patent, Claims 6, 14,[2] 24; | Plain and ordinary |

---

[2] The parties' claim construction materials raise disputes regarding "formed by at least the application of heat /

| | | |
|---|---|---|
| application of heat / applying the heat . . . to form" | '472 Patent, Claim 11; '020 Patent, Claim 3; '855 Patent, Claim 12; '856 Patent, Claim 4. | meaning. |
| "intersecting portion[s]" | '856 Patent, Claims 1, 5, 10, 11; '472 Patent, Claims 9-12. | Plain and ordinary meaning. |
| "partial melting / begin to melt" | '260 Patent, Claims 11, 29; '472 Patent, Claim 18; '020 Patent, Claim 10; '855 Patent, Claim 16; '856 Patent, Claim 6. | "heated portion(s) of one or more lashes of the cluster of lashes begin to connect to one or more other lashes" |
| "applying the heat . . . to seal the plurality of clusters along the length of the base" | '472 Patent, Claim 7. | Plain and ordinary meaning. |
| "designed to attach to the underside of [the/an] natural lashes / designed to at least attach the [artificial] lash extension to an underside of natural lashes / designed for an application under the natural lashes" | '260 Patent, Claims 1, 19; '472 Patent, Claim 1; '020 Patent, Claim 1; '856 Patent, Claims 19, 20. | Plain and ordinary meaning. |

---

applying the heat . . . to form" with respect to claim 14 of the '260 Patent. Claim 14 does not teach an application of heat. *See* '260 Patent, Claim 14 ("The artificial lash extension system of claim 1, wherein each of the plurality of lash extensions is further formed by an application of an adhesive.") It appears the parties intended to raise a dispute with respect to claim 13 of the '260 Patent. *See* '260 Patent, Claim 13 ("The artificial lash extension system of claim 1, wherein the application of heat comprises heat fusing."). Accordingly, the claim construction rulings stated herein apply to claim 13 instead of claim 14.